| | |
|---|---|
| IN RE: LIPITOR (ATORVASTATIN CALCIUM) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 2:14-mn-2502-RMG |
| *This document relates to*: All Cases | |

## PLAINTIFFS' STEERING COMMITTEE MEMORANDUM OF LAW IN OPPOSITION TO PFIZER'S MOTION TO EXCLUDE TESTIMONY OF JOHN ABRAMSON, M.D., AND OPINION TESTIMONY REGARDING CLINICAL TRIAL DATA IN LIPITOR NEW DRUG APPLICATION

H. Blair Hahn (Fed. I.D. # 5717)
RICHARDSON PATRICK WESTBROOK & BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
Telephone: (843) 727-6500
Facsimile: (843) 727-6642
bhahn@rpwb.com

*Plaintiffs' Lead Counsel*

Ramon Rossi Lopez (CA 86361)
LOPEZ MCHUGH, LLP
100 Bayview Circle, Suite 5600
Newport Beach, CA 92660
Telephone: (949) 737-1501
Facsimile: (949) 737-1504
rlopez@lopezmchugh.com

Jayne Conroy (NY 8611)
David F. Miceli (GA 503900)
SIMMONS HANLY CONROY LLC
One Court St.
Alton, IL 62002
Telephone: (618) 259-2222
Facsimile: (843) 7276642
jconroy@simmonsfirm.com
dmiceli@simmonsfirm.com

*Plaintiffs' Executive Committee on behalf the  Plaintiffs' Steering Committee*

August 21, 2015

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

    Dr. Abramson's Background and Qualifications ..................................................... 3

    Summary of the Opinions Dr. Abramson Offers in This Case ................................ 6

LEGAL STANDARDS .......................................................................................................... 6

ARGUMENT ...................................................................................................................... 9

    **I.**    DR. ABRAMSON IS HIGHLY QUALIFIED TO PROVIDE OPINIONS ON THE
ACCURACY OF PFIZER'S REPRESENTATIONS OF THE RISKS AND BENEFITS OF
LIPITOR ...................................................................................................... 9

        A.    Dr. Abramson Has the Education, Training, and Experience to Opine
on the Accuracy of Pfizer's Representations of the Safety and
Efficacy of Lipitor ....................................................................... 9

        B.    Dr. Abramson Has Never Been Disqualified by a *Daubert* Challenge
– Including Those Brought by Pfizer ......................................... 11

    **II.**    DR. ABRAMSON'S METHODOLOGY IS WIDELY ACCEPTED BY COURTS AND
JOURNALS ALIKE, AND IS WELL-DOCUMENTED THROUGHOUT HIS REPORT ......... 13

    **III.**    PFIZER'S PROPOSED "BIAS" EXCLUSION IS FACTUALLY AND LEGALLY
UNFOUNDED ............................................................................................ 16

    **IV.**    DR. ABRAMSON MAY EXPLAIN THE FACTUAL BASES OF HIS OPINIONS ............... 19

    **V.**    DR. ABRAMSON DOES NOT SPECULATE ON PFIZER'S STATE OF MIND .................. 20

    **VI.**    DR. ABRAMSON'S OPINIONS ARE WELL-FOUNDED THROUGHOUT his REPORT .... 21

CONCLUSION .................................................................................................................. 26

# TABLE OF AUTHORITIES

*Page*

## Cases

*Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311 (9th Cir.1995) ...................................... 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................... 2, 7, 8, 9, 22, 25

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liab. Litig.*, 2014 WL 3557345 (N.D. Tex. July 18, 2014) ............................................................................ 1, 11, 20

*In re Neurontin Marketing, Sales Practices, and Prod. Liab. Litig.*, No. 04-10981-PSB (D. Mass. Feb. 24, 2010) ........................................................................................................ 12

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, 2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) .......................................................................... 1, 11, 20

*In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571 (E.D.N.Y. 2007) ............................... 1, 11

*In re Zyprexa Products Liab. Litig.*, 2008 WL 2696916 (E.D.N.Y. July 2, 2008)......... 1, 6, 11, 13

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)...................................... 7, 8, 9, 13, 15

*Maggard v. Essar Global Ltd.*, No. 2:12CV00031, 2015 WL 1498965 (W.D. Va. April 1, 2015) .................................................................................................................................... 22

*Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Engineers*, No. CIV.A. 3:11-0149, 2012 WL 8503238 (S.D.W. Va. May 3, 2012).................................................................. 16, 17

*Smith v. Pfizer, Inc.*, 714 F. Supp. 2d 845 (M.D. Tenn. 2010) .................................................... 15

*TFWS, Inc. v. Schaefer*, 325 F.3d 234 (4th Cir. 2003)................................................................... 8

*United States v. Kelley*, 6 F. Supp. 2d 1168 (D. Kan. Feb. 24, 1998) ......................................... 17

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) ................................................................ 15

*Viterbo v. Dow Chem. Co*., 646 F. Supp. 1420, (E.D. Tex. 1986), *aff'd*, 826 F.2d 420 (5th Cir. 1987)............................................................................................................................... 17

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) ....................................... 7, 8, 15

## Rules and Regulations

Fed. R. Civ. P. 26(a)(2)(B)(i)........................................................................................................ 19

Fed. R. Civ. P. 26(a)(2)(B)(ii)....................................................................................................... 19

Fed. R. Evid. 611 ........................................................................................................................... 20

Fed. R. Evid. 702 ................................................................................................................. 7, 9, 25

## Other Authorities

4 Weinstein's Federal Evidence (1997) .......................................................................................... 17

Advisory Committee Notes, Federal Rule of Evidence 702 (2000 Amendments)................. 22, 25

# INTRODUCTION

Every court to consider the issue has found Dr. Abramson to be well-qualified to offer precisely the sort of expert opinions he offers in this case. *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liab. Litig.*, 2014 WL 3557345 (N.D. Tex. July 18, 2014); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, 2011 WL 6302287 (S.D. Ill. Dec. 16, 2011); *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 580 (E.D.N.Y. 2007); *In re Zyprexa Products Liab. Litig.*, 2008 WL 2696916, at *105-08 (E.D.N.Y. July 2, 2008).

John Abramson, M.D., M.Sc. is a physician trained in family-practice medicine with specialized training in epidemiology, statistics, research design, and health policy. He has recognized expertise in reading and understanding medical and scientific research. He also has substantial expertise in the impact of health care industry marketing on the sources of information upon which doctors rely. He teaches those subjects at Harvard Medical School and has published widely in that field over the past ten years. Dr. Abramson has repeatedly testified as an expert in his field, and no court has ever excluded his testimony.

In his Expert Report ("Report"), a copy of which is annexed as Exhibit 2 to Pfizer's motion[1], Dr. Abramson offers opinions about Pfizer's misrepresentation of the known risk of elevated glucose and new-onset diabetes associated with Lipitor therapy. His opinions and his report explain how Pfizer used, misused, and failed to use clinical data in such a way as to increase Lipitor utilization. Dr. Abramson is fully qualified to offer these opinions, which are both reliable and relevant.

---

[1] Because Pfizer provided copies of the expert reports and transcripts at issue, Plaintiffs cite to Pfizer's exhibits, rather than re-submitting the identical documents as Plaintiffs' exhibits. Pfizer's exhibits are referred to as "Def. Ex. 2."

Pfizer insists on mischaracterizing Dr. Abramson's opinions as involving expertise in cardiology, endocrinology, regulatory affairs, and other areas in which Dr. Abramson freely admits he is not an expert. Dr. Abramson, however, does not purport to offer opinions in any of those areas, and expertise in those areas is unnecessary to qualify him to express the opinions he does offer.

Nor does Dr. Abramson seek to opine about Pfizer's motives, intentions, or state of mind. Pfizer's argument on these issues is merely a diversion from the merits of the opinions that Dr. Abramson *does* to offer.

Many of the arguments Pfizer raises in its motion are entirely inappropriate for review under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For example, Pfizer's arguments relating to bias are immaterial under *Daubert*. Criticism of an expert's alleged bias goes to the weight, not the admissibility, of his opinions.

Pfizer complains that Dr. Abramson will provide at trial a summary of the evidence on which he relies. Whether such a summary is a good thing or a bad thing, it is not the basis for a *Daubert* challenge. The extent to which Dr. Abramson should be allowed to describe, explain, or summarize the voluminous facts and data on which he necessarily relies is a question to be dealt with at trial, where the Court has wide discretion to control the extent and content of the testimony offered in the context of the other evidence that has or will come in.

Pfizer attacks Dr. Abramson for having relied on the plain text of Lipitor's New Drug Application ("NDA") and the Integrated Summary of Safety Information ("ISS"). Pfizer insists that he was required to adopt a self-serving re-interpretation recently offered by a former Parke-Davis employee in an effort to minimize the significance of the relevant data. This garden-variety factual dispute is not the proper subject of a *Daubert* motion. To the extent that Pfizer

2

disputes Dr. Abramson's interpretation of the NDA or ISS, or the significance of the data, it can present its alternative interpretation for the jury's consideration at trial.

The issues properly before this Court on this motion are whether Dr. Abramson has the appropriate expertise to offer the opinions that are actually contained in his report and whether those opinions are reliable and relevant. As we demonstrate below, he does and they are. Pfizer's motion should therefore be denied in its entirety.

## STATEMENT OF FACTS

**Dr. Abramson's Background and Qualifications**

Dr. Abramson has been licensed to practice medicine in the state of Massachusetts since 1982. He is Board Certified in Family Medicine and has been a Diplomate of the American Board of Family Practice since 1982. He graduated *cum laude* from Harvard College in 1970. He attended Dartmouth Medical School and graduated with a degree in Medicine from Brown Medical School in 1976. He completed his residency at Case Western Reserve University from 1979 to 1981 and a Robert Wood Johnson Fellowship in Family Medicine at Case Western University from 1980 to 1982, earning a Master of Science in Family Practice degree. During this two-year fellowship, which included study of epidemiology, statistics, research design, and health policy, Dr. Abramson received training in the interpretation of scientific data. Additionally, he was a Senior Research Associate on the Faculty of the Institute for Health Policy, Heller School, Brande is University from 1992 to 1993, during which time he participated in a project that explored local control of health care resources to optimize allocation and health outcomes. From 1993 to 1995, he was the Chair of the Graduate Medical Education Committee (Family Practice Residency) at Beverly Hospital. Dr. Abramson served as Chair of the Department of Family Practice at Lahey Clinic in Burlington, Massachusetts from 1994 to 2001. (Def. Ex. 2 at ¶ 1).

In 1997, Dr. Abramson was appointed a clinical instructor in ambulatory care at Harvard Medical School. He held that position until 2009, when he was appointed a Lecturer in the Department of Health Care Policy. While at Harvard, he has taught both medical students and postgraduate students and lectured extensively as an invited speaker regarding the growing challenge to clinicians trying to make informed decisions about optimal pharmacotherapy for their patients. He has also served as a mentor for first year medical students in the Primary Care Mentorship Program and as a Preceptor and Tutor in the Primary Care Clerkship Program. In his teaching roles, Dr. Abramson has taught future physicians how to interpret and integrate medical literature and data into their risk/benefit analysis in choosing appropriate treatments for their patients. (Def. Ex. 2 at ¶ 2).

Dr. Abramson also has written extensively about the integrity of the information that doctors rely upon when making clinical decisions. In 2002, he left clinical practice to devote himself full-time to research this topic, specifically in regard to the healthcare industry and its impact on public health, public safety, and the quality of American healthcare. Since 2002, he has been researching, writing, lecturing, and teaching about how the information about drugs and other medical products available to practicing physicians impacts their medical decisions. He lectures at medical schools, hospital Grand Rounds, and to health insurers and purchasers about the growing commercial influence on the production and dissemination of medical information available to physicians, the public, and health policymakers. Importantly, he has published several articles in first-rate peer-reviewed journals about the influence of healthcare industry marketing on the practice of medicine; industry influence on the cholesterol guidelines; and the use of statins to prevent cardiovascular disease. (Def. Ex. 2 at ¶ 4).

His 26 years as a physician provides him personal experience in multiple practice areas relevant to this litigation. He has been a primary care doctor, where he was responsible for the evaluation, care, and treatment of numerous patients for wellness care and disease diagnosis, treatment, and management. He has prescribed many different drugs in the scope of his clinical practice for over two decades, and he has firsthand experience regarding the type and content of information physicians use to make informed decisions, including performing risk/benefit analyses and evaluating safety and efficacy of various treatments for a given patient. He has carefully read medical journals both as a practicing physician (to keep up to date on the latest developments that would impact the care and treatment of his patients) and as a researcher (to evaluate the quality of the scientific evidence presented). (Def. Ex. 2 at ¶ 5).

As a result of his extensive training, background, and experience, Dr. Abramson is well qualified to opine on evaluation of clinical trial data; the relationship between clinical trial data and published articles; the relationship between clinical trial data and business plans and marketing research; the relationship between clinical trial data and the information that is communicated to physicians and patients by various routes. (Def. Ex. 1 at 286:2-287:1) And he is well qualified to evaluate published articles for consistency with the underlying clinical data and for accuracy in the presentation of that information in the medical literature. (*Id*.)

Courts have repeatedly, and consistently, held that he is qualified to testify about:

(i)     the information physicians and health benefit providers rely upon in making decisions about the appropriate use of medications and medical devices,

(ii)    the methods by which pharmaceutical and medical device companies influence physicians, patients and health benefit providers to make clinical and formulary decisions about the use of medications and devices, and

> (iii) the methods that are at times used by pharmaceutical and medical device companies to increase doctors' prescribing of drugs or utilization of devices based on unsubstantiated claims of safety or efficacy or unsubstantiated comparative claims.

*See In re DePuy Orthopaedics,* 2014 WL 3557345; *In re Yasmin & YAZ,* 2011 WL 6302287; *In re Zyprexa* 493 F. Supp. 2d 571; *In re Zyprexa.,* 2008 WL 2696916.

Dr. Abramson has never been disqualified from testifying by a *Daubert* challenge. (Def. Ex. 2 at ¶ 8)

**Summary of the Opinions Dr. Abramson Offers in This Case**

Based on his exhaustive review of the relevant evidence, Dr. Abramson offers eleven opinions, including that:

> (i) Pfizer misrepresented its knowledge of the significantly increased risk of clinically meaningful hyperglycemia/new-onset diabetes associated with Lipitor therapy;

> (ii) Pfizer misrepresented the evidence of the benefit of Lipitor in women without pre-existing coronary heart disease; and

> (iii) As a result of Pfizer's omissions and misrepresentations, physicians and patients were not adequately, timely and sufficiently informed about the significant risks of clinically meaningful hyperglycemia and new-onset diabetes associated with Lipitor therapy.

*Id*. at ¶ 11-22.[2]

## LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence provides:

---

[2] Dr. Abramson's opinions are the subject of two other *Daubert* motions filed by Pfizer, one addressing the subject of general causation and the other addressing the efficacy of Lipitor in women. This memorandum addresses only the arguments set forth in the motion addressed specifically to Dr. Abramson; the arguments touching on Dr. Abramson in the other motions are addressed in Plaintiffs' separate oppositions to those motions.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court has a "gatekeeping role" with respect to expert testimony. *Daubert,* 509 U.S. at 596; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). *See also* Fed. R. Evid. 104(a) (trial court to determine preliminary questions of admissibility, including qualification of a person to be a witness). Accordingly, in order for an expert witness to testify to a scientific opinion, the trial court must first determine that proposed expert testimony is "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.

The gatekeeper role is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Indeed, the Fourth Circuit has recognized that "Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

In *Daubert*, the Supreme Court provided a list of four non-exhaustive factors that a court may use in making its gatekeeping determination of reliability: (1) "whether a theory or technique … can be (and has been) tested, " 509 U.S. at 593; (2) whether the theory "has been subjected to peer review and publication," *id*.; (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation," *id*. at 594; and (4) whether the theory or technique enjoys "general

acceptance" within a "relevant scientific community." *Id*.; *accord Westberry*, 178 F.3d at 261 n.1. The Supreme Court emphasized in *Daubert* that the inquiry is "a flexible one." 509 U.S. at 594. Moreover, "[t]hat an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science." *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 (9th Cir.1995) (on remand) ("*Daubert II* ").

The *Daubert* Court was careful to emphasize that the "overarching subject" of the Rule 702 inquiry "is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." 509 U.S. at 594-95. Accordingly, the Court explained, "[t]he focus … must be solely on principles and methodology, not on the conclusions that they generate. *Id.* at 595. The Fourth Circuit has echoed this caution. *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) ("In applying *Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself."); *Westberry* ("The inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached"). Nothing in Rule 702 or *Daubert* and its progeny, or in the rulings of the Fourth Circuit permits this Court to subject an expert's conclusions, as opposed to his methodology, to the *Daubert* analysis. Indeed, the Fourth Circuit has made clear that "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry*, 178 F.3d at 261.

*Daubert* does not require the subject of scientific testimony to be "'known' to a certainty," since science is an evolving process, and "arguably there are no certainties in science." *Daubert*, 509 U.S. at 590. The Supreme Court has recognized that there is a "range

where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts." *Kumho Tire*, 526 U.S. at153. The Court's function is simply to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Separate and apart from the reliability of the proffered testimony, the court must consider whether the evidence or testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591.

## ARGUMENT

### I. DR. ABRAMSON IS HIGHLY QUALIFIED TO PROVIDE OPINIONS ON THE ACCURACY OF PFIZER'S REPRESENTATIONS OF THE RISKS AND BENEFITS OF LIPITOR

#### A. Dr. Abramson Has the Education, Training, and Experience to Opine on the Accuracy of Pfizer's Representations of the Safety and Efficacy of Lipitor

Based on his education, training, two decades of clinical practice, teaching at Harvard Medical School, publication of peer-reviewed articles, and publication of a book about the influence of the pharmaceutical industry on the practice of medicine (including marketing of prescription drugs to physicians and the public), Dr. Abramson is exceptionally well qualified to testify regarding:

(i) the information physicians and health benefit providers rely upon in making decisions about the appropriate use of medications and medical devices;

(ii) the methods by which pharmaceutical companies influence physicians, patients and health benefit providers to make clinical and formulary decisions about the use of medications and devices;

(iii)    the methods that are at times used by pharmaceutical and medical device companies to increase doctors' prescribing of drugs or utilization of devices based on unsubstantiated claims of safety or efficacy or unsubstantiated comparative claims;

(iv)    the evaluation of clinical trial data, the relationship between clinical trial data and published articles, the relationship between clinical trial data and business plans and marketing research, the relationship between clinical trial data and the information that is communicated to physicians and patients by various routes; and

(v)    the evaluation of published articles for consistency with the underlying clinical data and for accuracy in the presentation of that information in the medical literature.

Pfizer claims that Dr. Abramson is not qualified to provide any opinions in this case because he is not a "methodologist," cardiologist, endocrinologist, lipidologist, diabetologist, epidemiologist, or regulatory expert. However, Dr. Abramson does not offer any opinions requiring expertise in those areas. He is an expert in how healthcare companies can and sometimes do misrepresent the results of clinical trials and how doctors evaluate the information provided to them and make treatment decisions. He is exceptionally well qualified to offer opinions in this case about the integrity and implications of the information that Pfizer disseminated, and failed to disseminate, to doctors and the scientific community. Moreover, his training as a physician, as well as his specific training in epidemiology, statistics, research design, health policy, and the interpretation of scientific data, *see* Def. Ex. 2 at ¶ 1, qualifies him to read medical studies and to compare the results of those studies to Pfizer's marketing

materials, to determine the extent to which those materials reflect, or do not reflect, the scientific evidence.

**B.      Dr. Abramson Has Never Been Disqualified by a *Daubert* Challenge – Including Those Brought by Pfizer**

Perhaps the most telling weakness of Pfizer's motion is not its disregard for Dr. Abramson's distinguished qualifications in favor of shallow personal attacks, but rather is its failure to disclose to this Court the unbroken line of prior decisions finding Dr. Abramson to be well-qualified to offer precisely the sort of expert opinions he offers in this case.

Most recently, for example, in *In re DePuy Orthopaedics*, the court said:

> Dr. Abramson offers opinions about the truth of DePuy's marketing and about its failure to disclose information in its possession concerning complications with the Pinnacle Device. His opinions and report explain how DePuy used its marketing to communicate messages about the Pinnacle Device that were not supported by the data and how DePuy disguised marketing messages through the use of key opinion leaders and sponsorship of continuing medical education and other programs, research, and publications. *Dr. Abramson is more than qualified to give these opinions.*

2014 WL 3557345 at *13 (emphasis added). Likewise, in *In re Yasmin & YAZ*, the court found:

> Based upon Dr. Abramson's extensive academic and practical experience, the Court finds that Dr. Abramson qualifies as an expert in this case. Dr. Abramson has been a physician for over twenty-five years in various capacities, has published several peer-reviewed articles, and a book about the influence of the pharmaceutical industry on the practice of medicine, including the marketing of prescription drugs to physicians and the public. Accordingly, the Court finds that Dr. Abramson is qualified to testify as an expert for things he addresses in his report.

2011 WL 6302287 at *16-17.  In *In re Zyprexa* 2007, the court not only found Dr. Abramson to be qualified, 493 F. Supp. 2d at 580, but the court *itself* later extensively relied on his opinions in ruling on class certification. *See, e.g.*, 2008 WL 2696916 at *105-09.

Pfizer's motion not only fails to mention those prior rulings, it also fails to vouchsafe to this Court *its own* unsuccessful efforts to disqualify Dr. Abramson at trial on grounds nearly identical to those offered here:

> MR. CHEFFO: … The next issue here just goes to … who Dr. Abramson is. He's a family practice doctor. He's been a professional witness who's never been an expert in bipolar, neuropathic pain. He wrote a book, and he was on CNN apparently for something. Basically he has testified beyond what I think your Honor would probably allow most of the efficacy experts to testify as far as efficacy. He's talked about how he's looked at some documents, he's looked at literature, and he now knows that this medicine doesn't work. He has never been qualified to even treat a psychiatric patient as far as the foundation shows.

> THE COURT: *At least so far, all I've seen is that he's looked at clinical trials that show they work, which he does have a background to look at.* He doesn't have any independent knowledge, and you can cross him on that. He's just looking at the results of a clinical trial.

> MR. CHEFFO: Well, but he's stating much more than that, your Honor. First of all, there's no evidence that he's an expert in clinical trials.

> THE COURT: He had a three-year fellowship in it. I mean, I listened to the background; Robert Wood Johnson Fellow in biostatistics something, something, epidemiology and something else.

> ….

> THE COURT: Excuse me. *At least what I hear them doing, and I'll be conscious of it, is, do these tests demonstrate efficacy? Answer, no. He's got the experience to do that.*

*In re Neurontin Marketing, Sales Practices, and Prod. Liab. Litig.*, No. 04-10981-PSB (D. Mass.) Trial Transcript at 8:24-10:10. (Feb. 24, 2010) (emphasis added).[3]

Pfizer offers no good reason why this Court should refuse to follow the well-reasoned decisions of every district judge to consider the issue. Dr. Abramson is well qualified to offer the opinions set forth in his report.

---

[3] Attached hereto as Exhibit A are the relevant excerpts from the cited trial transcript.

## II. DR. ABRAMSON'S METHODOLOGY IS WIDELY ACCEPTED BY COURTS AND JOURNALS ALIKE, AND IS WELL-DOCUMENTED THROUGHOUT HIS REPORT

Dr. Abramson's methodology has been accepted as reliable in every court that has had occasion to evaluate it. *See In re DePuy Orthopaedics,* 2014 WL 3557345; *In re Yasmin & YAZ,* 2011 WL 6302287; *In re Zyprexa* 493 F. Supp. 2d 571; *In re Zyprexa.*, 2008 WL 2696916. The result here should be no different.

Pfizer's generalized claims that Dr. Abramson's methodology is lacking are entirely unsubstantiated. First, Pfizer's claim that Dr. Abramson "invented his own personal methodology" is not merely incorrect; it demonstrates a fundamental misunderstanding of his expertise and the requirements of *Daubert*. The central focus of the Court's analysis under *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Moreover, a courts' focus in not on the specific factors enumerated in *Daubert*, but how the principles inherent in those factors apply in an expert-centric analysis. *Id*. at 150 ("We agree with the Solicitor General that '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony'") (citation omitted).

Harvard Medical School has engaged Dr. Abramson to teach future physicians how to interpret and evaluate medical literature when they perform risk/benefit analyses for their patients. (Def. Ex. 2 at ¶ 2) That is compelling proof that his methodology enjoys acceptance in the medical community. He employs the same methodology here as he does when he teaches.

Dr. Abramson's peer-reviewed publications and reports also show that his well-developed methodology has been accepted in the medical community. For example, in 2013, Dr. Abramson and colleagues published an article in the *British Medical Journal* demonstrating that "the evidence does not show that the benefits of statins in low risk patients outweigh the harms and that the advice for treatment of this group should not be changed." Abramson, *et al., Should people at low risk of cardiovascular disease take a statin?*, 347 BMJ f6123 (2013). *See* Exhibit B. In that article, Dr. Abramson employed the same analytical approach he offers in this case to scrutinize the 2013 Cochrane review of primary prevention with statins. Dr. Abramson used the meta-analysis published by the Cholesterol Treatment Trialists' Collaboration in 2012 to examine the need for updated evidence-based guidelines given the risk/benefit profile of statins. As with his report in this case, Dr. Abramson exhaustively explained how the clinical data on the efficacy, or lack thereof, of statins for primary prevention, combined with the risk of certain adverse events, including diabetes, should be properly communicated to treating physicians though relevant guidelines. Not only was Dr. Abramson's article published in *BMJ*, but it also withstood a vigorous attack by industry insiders.[4]

Given the broad acceptance of Dr. Abramson's methodology,[5] it is clear that Dr. Abramson applies the "same level of intellectual rigor" in his report as he does in his profession.

_____

[4] The lead author of the meta-analysis that Dr. Abramson relied upon attempted to *privately* have Dr. Abramson's article retracted after it had been published. In response to the private retraction request, *BMJ publically* convened an *independent review panel*, which determined that Dr. Abramson's article should not be retracted.

[5] Dr. Abramson's article in *BMJ* is by no means the only article demonstrating the acceptance of his methodology in the medical community. *See, e.g.,* Def. Ex. 1 at 373:12-14 (A: "Well, pieces of that methodology would be in my articles that I've published as in the JAMA article *Is Clinical Trial Data a Public Good*?).

Pfizer claims that Dr. Abramson's methodology is unreliable because it cannot be replicated, but analytical expert testimony, like that offered by Dr. Abramson, is by its very nature not subject experimental duplication. As the Fourth Circuit explained:

> Experiential expert testimony … does not "rely on anything like a scientific method." [Fed. R. Evid. 702 advisory committee's note.] But this does not lead to a conclusion that "experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id.* While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id.*

*United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007); s*ee also Kumho Tire*, 526 U.S. at 156 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). The Fourth Circuit's interpretation of Rule 702 is entirely consistent with the Supreme Court's mandate that district courts employ a "flexible" inquiry in assessing reliability. *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594–95).

Courts have rejected Pfizer's attacks on analytic experts. For example, in *Smith v. Pfizer, Inc.*, 714 F. Supp. 2d 845 (M.D. Tenn. 2010), Pfizer raised a nearly identical attack on an economist. In that case, Dr. Charles King III, Ph.D., provided an analysis of voluminous internal company documents and government records and concluded that Pfizer's "off-label marketing campaign led to an increase in off-label prescriptions." *Id*. at 855. Specifically, Dr. King used Pfizer's internal documents in conjunction with industry sales data to "examine[] characteristics of the prescription drug marketplace and explain[], in that context, the goals and effects of the defendants' marketing efforts." *Id*. at 856. Pfizer argued that the expert "reach[ed] his

conclusions by mere *ipse dixit* and that he employ[ed] no ascertainable methodology at all." The court rejected Pfizer's argument:

> But a review of King's report shows that, in explaining the characteristics of the prescription drug marketplace, he relies on and frequently cites scholarly articles and studies. Then, employing this understanding of the drug marketplace and how marketing campaigns generally influence doctors, King examines Neurontin sales data and opines on the effects of the defendants' marketing. King's conclusions are not mere "rank speculation," despite the fact that he did not interview individual doctors to determine why they personally prescribed Neurontin.

*Id.* at 856 (citations omitted).

Pfizer's attack on Dr. Abramson's methodology should be rejected for the same reason that its attack on Dr. King's methodology was rejected. Dr. Abramson begins his analysis with study data protocols and primary data, and he meticulously traces how the study data found its way into scholarly publications, and how the study results were used – misused actually – to support Pfizer's marketing messages. His analysis is thoroughly documented step-by-step, and is supported by the direct use of clinical study data and Pfizer's own representations.

## III.  PFIZER'S PROPOSED "BIAS" EXCLUSION IS FACTUALLY AND LEGALLY UNFOUNDED

Pfizer argues at length that Dr. Abramson is a biased hired-gun whose opinions should be excluded under Rule 702. Its arguments are without factual or legal foundation. Dr. Abramson's long history of research and publication on the topics in his report began long *before* he began consulting for litigation. In any event, "it is well-settled that an expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." *Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Engineers*, No. CIV.A. 3:11-0149, 2012 WL 8503238 (S.D.W. Va. May 3, 2012) (internal quotations omitted).

Dr. Abramson left clinical practice in 2002 to devote himself full-time to research the pharmaceutical industry and its impact on public health, public safety, and the quality of

American healthcare. After his book was published in 2004, Dr. Abramson continued to research and publish scholarly articles analyzing the clinical data that was driving evidence-based medicine. Notably, it was not until after Dr. Abramson had published his book (more than twenty years into his medical career) that he first provided expert opinions in litigation.

Pfizer seeks to exclude Dr. Abramson' testimony on the ground that he is a "professional litigation expert who has not practiced medicine in thirteen years" and who has earned millions of dollars over the past 10 years working as a plaintiffs' expert, "which is how he spends 85-90% of his time." (Def. Br. at 2) These facts, however, are not grounds to exclude Dr. Abramson's testimony. "Impartiality is not a requirement for being an expert witness." *United States v. Kelley*, 6 F. Supp. 2d 1168, 1183 (D. Kan. Feb. 24, 1998). "An expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." *Id., quoting* 4 Weinstein's Federal Evidence § 702.06[8], p. 702–45 (1997).[6]

Pfizer cites *Kelley* for the proposition that "[c]ourts have excluded experts who, like Dr. Abramson, had developed 'preconceived notions before the litigation commenced.'" (Def. Br. at 18) Like "bias," however, "preconceived notions" are not grounds for disqualification. And *Kelley* is not to the contrary.

As the court explained in *Ohio Valley Envtl. Coal.*, "[t]he court in *Kelley* limited the scope of expert testimony largely because the proffered expert lacked "any academic

---

[6] In this regard it is instructive to compare Dr. Abramson's background with that of one of Pfizer's experts. Dr. Lisa Rarick is a professional litigation expert who left the FDA 12 years ago; 90 percent of her clients are related to pharmaceutical companies; more than 90 percent of her income over the last 12 years is related to the work for pharmaceutical companies; all of the litigation work she has done over the past 12 years has been on behalf of pharmaceutical companies; and she has been paid millions of dollars representing pharmaceutical companies. Rarick Tr. at 37:6-38:19, 63:14-65:23 (attached hereto as Exhibit C).

background, formal education or training, and experience that would qualify him as an expert." *Id.* at *1; *see Kelley*, 6 F. Supp. 2d at 1184.

*Kelley* relied, as an additional basis for its conclusion that the witness was unqualified, on a line of cases that hold that an expert's testimony may be excluded as unfairly prejudicial and misleading if the expert has become a "self-created," *id*. at 1185, "advocate for a cause," *id*. at 1183. As the *Kelley* court stated, and as the court in *Ohio Valley Envtl. Coal.* explained, however, the "critical fact" in each of those cases was that the expert had affirmatively sought employment from the plaintiff's attorneys. *See Kelley, 6 F. Supp. at 1183; Ohio Valley Envtl. Coal., at *2; see, e.g.*, *Viterbo v. Dow Chem. Co*., 646 F. Supp. 1420, 1424 (E.D. Tex. 1986), *aff'd*, 826 F.2d 420 (5th Cir. 1987). This Court need not consider the question whether the "self-created advocate for a cause" line of cases are sound, because the critical fact on which they are each based is lacking in this case: there is not the slightest suggestion that Dr. Abramson sought out employment with PSC. Moreover, as already discussed, Dr. Abramson's expertise was developed and established before he ever became an expert witness.

Thus, *Kelley* does not support Pfizer's argument that a witness may be disqualified as an expert if he has "preconceived notions." Indeed, a rule that excluded experts on grounds that they have "preconceived notions" would directly conflict with the requirements of *Daubert*. Under such a rule, an expert's extensive background, education, training, experience, and publication – all of which would inevitably give rise to views that might fairly be described as "preconceived notions" – would serve as a basis for exclusion, rather than qualification, of the expert – which would stand *Daubert* on its head. Furthermore, such a rule it would necessarily require the Court to make a *conclusion-based* exclusionary ruling, rather than one based on relevance and reliability. Like a claim of bias, a claim that an expert holds, and is relying on, erroneous

"preconceived notions" should be addressed on cross-examination, not on a *Daubert* motion. *See also* Plaintiffs' Memorandum of Law in Response to Pfizer, Inc.'s Motion to Exclude Expert Testimony and Claims that Lipitor Is Not Effective for and Should Not Be Approved for Primary Prevention in Women ("Pltf. Efficacy Br.") at Point IC2.

## IV.  DR. ABRAMSON MAY EXPLAIN THE FACTUAL BASES OF HIS OPINIONS

In an effort to prevent the jury from understanding the relevant scientific and medical evidence, Pfizer argues, in effect, that Dr. Abramson should be precluded from explaining the extensive factual basis for his opinions. Its argument confuses Dr. Abramson's report with his testimony.

Rule 26 requires the Plaintiffs to include in their expert reports not only "(i) a complete statement of all opinions the witness will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B)(i), but also a statement of "the facts or data considered by the [expert] witness in forming [the opinions]." Fed. R. Civ. P. 26(a)(2)(B)(ii). Dr. Abramson's report fully complies with both requirements: it sets forth his opinions, and it also provides the basis and reasons for those opinions and the facts and data he considered in forming those opinions.

Because Dr. Abramson's analysis has been so exhaustive, the statement of facts and data he considered is voluminous. At trial, however, Plaintiffs certainly do not expect or intend for Dr. Abramson to regurgitate all of the facts and data that he was required to include in his 227-page report. The extent to which that evidence can or should be admitted through Dr. Abramson himself, or though other evidence, such as testimony of other witnesses or the admission of the documents cited in the report, and the extent to which summaries of some portions of this evidence by Dr. Abramson may assist the jury in understanding both the evidence itself and Dr. Abramson's opinions based on that evidence, does not implicate this Court's gate-keeping role

under *Daubert*. It is, rather, a matter of this Court's discretion over the presentation of evidence at trial.

In rejecting a virtually identical attack on Dr. Abramson, the court in *In re Yasmin & YAZ* said:

> As to defendant's argument regarding narrative testimony, the Court has broad discretion over the mode and order of examining witnesses and presenting evidence and may allow testimony in narrative form at trial if the Court finds that it would helpful to the jury. … The same holds true with regard to testimony in summary format. … Such matters will be decided at trial in context specific situations and will be ruled upon then. The Court's rulings on these matters will likely be impacted by whether the evidence that the narrative or summary relates to is admitted. Moreover, if evidence is admitted in narrative or summary form, defendants will have an opportunity during cross-examination or presentation of its own evidence to address any concerns defendants might have.

*In re Yasmin & YAZ*, 2011 WL 6302287 at *8 (citations omitted); *accord In re DePuy Orthopaedics*, 2014 WL 3557345 at *8 ("The admission of Dr. Abramson's alleged speculation and narrative testimony, however, is not properly the subject of this Court's gatekeeping function under *Daubert*. It implicates this Court's discretion over the presentation of evidence at trial and should be taken up there."); Fed. R. Evid. 611 (directing court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence").

The Court should follow the approach taken in *In re Yasmin & YAZ* and *In re DePuy Orthopaedics* and address at trial the nature and extent of summary evidence that Dr. Abramson may properly present in explaining the basis for his opinions.

## V.     DR. ABRAMSON DOES NOT SPECULATE ON PFIZER'S STATE OF MIND

Pfizer claims that Dr. Abramson intends to provide his personal views of its state of mind, but this mischaracterizes the opinions in his report. Dr. Abramson's opinions are based on his review of facts that were in Pfizer's possession as shown by the documentary record. None of the excerpts of Dr. Abramson's report that Pfizer points to impute motives or intentions to Pfizer.

It is true, of course, that Dr. Abramson discusses evidence of what Pfizer *knew*. Pfizer, however, conflates knowledge – which can be objectively determined from the documentary record – with motive and intent, which are subjective. Review of Dr. Abramson's proposed opinions shows them to be devoid of language characterizing the reasons for Pfizer's conduct. Instead, Dr. Abramson's opinions compare the information that Pfizer provided to doctors with the information contained in its internal documents said – a comparison he is well-qualified to make. He also expresses opinions about the impact of Pfizer's information on the risk/benefit analyses of physicians, which he is also well-qualified to do.

Pfizer seeks to exclude the entirety of Dr. Abramson's testimony because it claims that certain language in his report is suggestive of conclusions about Pfizer's intentions or motives. Although Pfizer provides some examples, none come from the opinions Dr. Abramson intends to offer, and each are statements about what information was available to Pfizer (and thus what it "knew"), rather than about its motives or intentions. Pfizer's attempt to mischaracterize cast Dr. Abramson's well-supported opinions on its knowledge as "state of mind" opinions misses the mark and should be rejected.

## VI.  DR. ABRAMSON'S OPINIONS ARE WELL-FOUNDED THROUGHOUT HIS REPORT

Pfizer argues that Dr. Abramson's opinions rely on unfounded assumptions and insufficient data, but when it finally descends to the particulars, it turns out that Pfizer is actually claiming that Dr. Abramson's opinions should be excluded in their entirety because he disagrees with Pfizer's post-litigation attempt to minimize the significance of the clinical data. Pfizer's argument lacks both legal and factual merit.[7]

---

[7] Pfizer's motion purports to exclude Dr. Abramson's and "other experts'" opinions on the NDA. (footnote continues on next page)

The argument lacks legal merit because a factual dispute is not a proper basis for exclusion under *Daubert*:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment [to Rule 702] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts or the other.

Advisory Committee Notes, Federal Rule of Evidence 702 (2000 Amendments). "Stated differently, the jury must decide the disputed facts in this case, and if it disagrees with [a party's] interpretation of the facts, that is an issue of the weight and impeachability of his testimony, and not its admissibility. *Maggard v. Essar Global Ltd.*, No. 2:12CV00031, 2015 WL 1498965 at *3 (W.D. Va. April 1, 2015) (citation omitted).

Indeed, *Daubert* makes clear that factual disputes are to be resolved by juries not judges. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

Pfizer's seeks exclusion of Dr. Abramson's opinions not because he lacks a factual basis for his opinion but rather because he does not agree with Pfizer's self-serving interpretation of the data. That is not a basis for exclusion under *Daubert*.

Pfizer's argument also lacks factual merit. Pfizer contends that Dr. Abramson's opinion is based on unsupported factual assumptions that are contrary to the evidence. On the contrary, Dr. Abramson relies on the plain meaning of the relevant documents.

---

However, its motion focuses solely on Dr. Abramson. The PSC addresses the merits of Pfizer's argument with respect to Dr. Abramson in this section. To the extent Pfizer seeks to exclude other experts' opinions on the NDA, those arguments are addressed in Plaintiffs' Steering Committee Memorandum of Law in Opposition to Pfizer's Motion to Exclude Plaintiffs' Expert Testimony on the Issue of General Causation.

For example, on June 17, 1996, Parke-Davis filed its Lipitor NDA, which included an Integrated Summary of Safety ("ISS"). The ISS summarized exposure, demographic and safety data from 21 completed clinical studies of 3,522 patients, 2,502 of whom had received Lipitor. At issue here is the accounting of individuals in placebo controlled studies that experienced a "clinical lab abnormality." The data were summarized in Table 42:

TABLE 42. Placebo-Controlled Data Grouping: Clinical Laboratory Abnormalities [Number (%) of Patients]

| Laboratory Parameter | Criteria | Placebo N = 270 | | Atorvastatin 10 mg N = 863 | | Atorvastatin 20 mg N = 36 | | Atorvastatin 40 mg N = 79 | | Atorvastatin 80 mg N = 94 | | Combined[a] Atorvastatin N = 1122 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alk Phos | >3.00 × ULN | 1 | (<1) | 0 | (0) | 0 | (0) | 0 | (0) | 3 | (3) | 3 | (<1) |
| ALT | >ULN | 31 | (11) | 139 | (16) | 4 | (11) | 27 | (34) | 42 | (45) | 219 | (20) |
| AST | >ULN | 25 | (9) | 110 | (13) | 4 | (11) | 19 | (24) | 37 | (39) | 176 | (16) |
| BUN | >2.00 × ULN | 0 | (0) | 1 | (<1) | 0 | (0) | 0 | (0) | 0 | (0) | 1 | (<1) |
| CPK | >5.00 × ULN | 0 | (0) | 4 | (<1) | 0 | (0) | 1 | (1) | 1 | (1) | 6 | (1) |
| Glucose | >1.25 × ULN | 3 | (1) | 30 | (3) | 2 | (6) | 1 | (1) | 4 | (4) | 37 | (3) |
| Hematocrit | <0.75 × LLN | 0 | (0) | 1 | (<1) | 0 | (0) | 0 | (0) | 0 | (0) | 1 | (<1) |
| Hemoglobin | <0.75 × LLN | 0 | (0) | 1 | (<1) | 0 | (0) | 0 | (0) | 0 | (0) | 1 | (<1) |
| Total Bilirubin | >1.50 × ULN | 1 | (<1) | 9 | (1) | 0 | (0) | 1 | (1) | 2 | (2) | 15 | (1) |
| WBC | <0.75 × LLN | 4 | (1) | 9 | (1) | 0 | (0) | 2 | (3) | 1 | (1) | 12 | (1) |
| | >1.50 × ULN | 0 | (0) | 2 | (<1) | 0 | (0) | 0 | (0) | 0 | (0) | 2 | (<1) |
| Any Abnormality | | 44 | (16) | 214 | (25) | 8 | (22) | 33 | (42) | 50 | (53) | 314 | (28) |

Alk Phos = Alkaline Phosphatase; ALT = Alanine Aminotransferase; AST = Aspartate Aminotransferase; BUN = Blood Urea Nitrogen; CPK = Creatine Phosphokinase.
[a] Contains data for patients who received 2.5 mg (N = 11), 5 mg (N = 26), and 60 mg (N = 13) atorvastatin.

In evaluating the data summarized in Table 42, Dr. Abramson used the definition of "Clinical Laboratory Abnormalities" in Section 5.2, which explicitly excludes any "laboratory parameters with values that met criteria for a clinically meaningful deviation *but were not different from the patient's baseline value*." For the convenience of the Court, we reproduce Section 5.2 below as it appears in the original document:

RR-REG 720-03452                    106
Atorvastatin Calcium
Tablets

**5.2.    Clinical Laboratory Abnormalities**[s]

In the atorvastatin program, clinical laboratory parameters were evaluated for abnormal values during treatment using normal ranges supplied by the central laboratory and program-defined criteria.  These criteria were established before studies began and were designed to identify clinically meaningful changes.  Laboratory abnormalities were identified relative to each patient's baseline value.  Thus, during treatment, laboratory parameters with values that met criteria for a clinically meaningful deviation but were not different from the patient's baseline value were not identified as abnormalities.

**5.2.1.    Placebo-Controlled Studies Data Grouping**

Overall, a higher proportion of atorvastatin-treated patients in each dose group and the combined dose group (28% of 1122 patients) had clinical laboratory abnormalities than placebo-treated patients (16% of 270 patients) (Table 42).  Of the laboratory abnormalities summarized in Table 46, increases in ALT, AST, and glucose were of interest.  ALT elevations > ULN are summarized in Table 41.  Only 19 of the 219 atorvastatin-treated patients with abnormal ALT laboratory values had clinically important events.  These patients are discussed in detail in Section 5.3.2.  Elevations in glucose are discussed in detail in Section 5.2.4.

Since the "clinical laboratory abnormalities" recorded in Table 42, by definition, included those individuals who experienced an abnormality "relative to baseline," Dr. Abramson concluded that Table 42 demonstrated Lipitor patients experienced a "three-fold risk of elevated glucose with Lipitor versus placebo."  (Def. Ex. 2 at ¶ 58)

Pfizer argues that Dr. Abramson's opinions must be excluded because he *failed to disregard* the last two sentences of Section 5.2 in his interpretation of Table 42. Rather than rely on the plain language of the ISS itself, Pfizer argues that Dr. Abramson's was required to defer to Dr. Black, a former Parke-Davis employee who proffered a strained re-interpretation of the data more than 19 years after the fact.

According to Dr. Black, even though Table 42 plainly shows a three-fold increased risk of elevated glucose, the health risk is not really as great as the table makes it appear, because some of the people who experienced a clinically meaningful increase in their glucose levels on Lipitor supposedly already had elevated glucose levels at baseline. *See* Exhibit D.   In other words, Dr. Black (and through him Pfizer) seeks to minimize the significance of the data by ignoring those individuals who had elevated glucose levels to begin with – as if people with elevated glucose levels cannot be harmed by a *further* elevation of their glucose levels. Whether Dr. Black or the FDA actually did or did not discount the risk by ignoring those patients 19 years ago is a red herring. The significance of the table, and of the data on which it is based, is that it shows that Lipitor is associated with increased glucose levels.

Dr. Abramson is not required to accept Dr. Black's interpretation of the data. Dr. Abramson is an expert in the interpretation of clinical trial data, and he is entitled to offer his own well-reasoned interpretation of the data. He is just as qualified to evaluate the data as Dr. Black. At trial, it will be up to the jury to decide which expert is more credible.

Pfizer's argument merely demonstrates a fundamental *factual* disagreement between expert witnesses.  Such disputes are precisely the type of "competing versions of the facts" that the advisory committee to Rule 702 warned are not intended to serve as the basis for exclusion. Advisory Committee Notes, Federal Rule of Evidence 702 (2000 Amendments).[8]  Pfizer's attempts to usurp the jury's role as the ultimate finder of fact should be rejected.

---

[8] Pfizer's argument with respect to Dr. Abramson's "inadmissible" interpretation of the ASCOT study documents fails for the same reasons. Dr. Abramson comprehensively substantiates his interpretation of the ASCOT data in his report, as required by Rule 702 and *Daubert*. Pfizer's disagreement with his interpretation may be an appropriate subject for cross-examination trial; it is not a basis for exclusion of his testimony.  *See also* Pltf. Efficacy Br. at IB, IC1.

# CONCLUSION

The Court should deny in its entirety Pfizer's motion to exclude Dr. Abramson's opinions.

August 21, 2015

Respectfully Submitted,

/s/ H. Blair Hahn
H. Blair Hahn (Fed. I.D. # 5717)
RICHARDSON PATRICK
WESTBROOK & BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
bhahn@rpwb.com
Telephone: (843) 727-6500
Facsimile: (843) 727-6642

*Plaintiffs' Lead Counsel*

Jayne Conroy (NY 8611)
David F. Miceli (GA 503900)
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Telephone: (618) 259-2222
Facsimile: (618) 259-2251
jconroy@simmonsfirm.com
dmiceli@simmonsfirm.com

Ramon Rossi Lopez
LOPEZ MCHUGH, LLP
100 Bayview Circle, Suite 5600
Newport Beach, CA 92660
Telephone: (949) 737-1501
Facsimile: (949) 737-1504
rlopez@lopezmchugh.com

*Plaintiffs' Executive Committee on behalf the*
*Plaintiffs' Steering Committee*